80 N.J. Super. 310 (1963)
193 A.2d 513
BERNARD J. SHUMAN, M.D., PLAINTIFF,
v.
NATIONAL CASUALTY CO., A CORPORATION OF THE STATE OF MICHIGAN AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided August 2, 1963.
*312 Mr. Benjamin Rimm for plaintiff.
Mr. Michael D. Loprete for defendant (Mr. Merritt Lane, Jr., of counsel; Mr. Michael D. Loprete on the brief; Messrs. McCarter & English, attorneys).
NAAME, J.C.C. (temporarily assigned).
This is an action by plaintiff Dr. Bernard J. Shuman, a former practicing pediatrician, to recover indemnity payments under part II of an extended professional disability policy (No. X3310863) which purports to insure the plaintiff against total disability for the period not to exceed 60 months, provided the insured "shall be wholly and continuously disabled from engaging in any gainful occupation for which the Insured is reasonably fitted or qualified and under the regular care and attendance of a legally qualified physician or surgeon, other than himself * * *." (Emphasis added)
Plaintiff, who is now 43 years old, has a New Jersey medical license to practice "any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition * * *." N.J.S.A. 45:9-5.1 and 45:9-15. Plaintiff elected to specialize in pediatrics and continued that practice until December 6, 1959.
On December 6, 1959 plaintiff was making a call or driving to some place when he experienced a tightness or uncomfortable feeling in his chest. He ignored the pain but it persisted; he became alarmed and stopped at the office of Dr. Joseph A. Linsk, a hemotologist in Atlantic City. Dr. Linsk examined plaintiff, took an electrocardiogram and conducted laboratory and blood tests.
*313 It was discovered later that plaintiff had suffered a coronary occlusion, and he was confined to bed for some time  three or four weeks. Other tests and treatment followed, and plaintiff from the onset of the aforesaid heart attack began taking dicumerol, an anti-blood coagulant, and was still consuming dicumerol three times a day as of July 7, 1962.
After plaintiff was allowed to leave his bed he experienced very marked weakness for several weeks, and apparently did little if any work thereafter in his former occupation as a pediatrist. Furthermore, it appears from the record that plaintiff did nothing productive or remunerative until he commenced a residency in psychiatry at the Philadelphia Psychiatric Hospital in July 1960.
Plaintiff has had no symptoms following the alleged onset of the heart condition on December 6, 1959, nor has he been under the regular care and attendance of a physician or surgeon for the past year or more.
Plaintiff, after sustaining the above heart attack, received monthly sickness indemnity payments from defendant under policy No. P310863 for a period of 24 months, until December 11, 1961, the terminal date, at the rate of $300 a month, a total of $7,200. However, defendant refused to continue monthly sickness indemnity payments (for purported "total disability") under part II of the extended professional disability policy (No. X3310863) beyond December 11, 1961, the terminal date of policy No. P310863 as aforesaid.
The reason advanced by defendant for the refusal  and this is the principal if not sole issue in this matter  is that plaintiff is now and has been since July 1960 engaged in a gainful occupation for which he is reasonably fitted or qualified, which activity allegedly disqualifies him from receiving the aforesaid indemnity payments under the extended professional disability policy.
The aforesaid allegedly gainful occupation originated or was initiated when plaintiff began a residency at the Philadelphia Psychiatric Hospital, which was completed there by July 1, 1962 but which continued at the Philadelphia Guidance *314 Center. The residency at the latter institution will terminate in June 1964. This residency carried with it a special trainee stipend from the afore-mentioned institutions of $12,000 a year, which was paid by the National Institute of Mental Health, hereinafter designated the Institute. Plaintiff has received $12,000 a year during the past three years. These stipends are given to the aforesaid institutions by the Institute under a program of grants to support psychiatric training programs for general practitioners and other physicians in practice, one of the purposes of which is to provide support at an adequate level for psychiatric residency training for physicians in practice who wish to become psychiatrists.
During plaintiff's residency at the Philadelphia Psychiatric Hospital he was at the hospital Monday through Friday and frequently the morning hours of each week. His hours were from 9 A.M. to 5 P.M. Monday through Friday, and 9 A.M. to noon when he was there on Saturday. Half a day was spent in didactics, conferences and seminars, the other half interviewing new patients or patients in the out-patient department. He also treated ward patients.
At the present time he is continuing his training as a resident at the Philadelphia Guidance Clinic, which is wholly out-patient. His hours are 8:30 A.M. to 5 P.M. five days a week. This employment will continue until he completes his training in June 1964.
The parties have stipulated that (1) the adjusted gross income received by plaintiff as a pediatrist in the three years immediately previous to his heart attack was $20,890.30 in 1957, $22,187.36 in 1958, and $22,152.81 in 1959; (2) Dr. Shuman's present remuneration from the Philadelphia Guidance Clinic is $12,000 per year; (3) the foregoing amount is subject to federal income tax, and (4) items of expense, such as tuition, books and laboratory or other fees, are not payable by plaintiff.
Defendant now moves for summary judgment.
Plaintiff alleges that defendant is not entitled to summary judgment because there are numerous factual questions involved *315 which should be determined by a jury, and that he is totally disabled within the contemplation and meaning of extended professional disability policy No. X3310863, i.e., "wholly and continuously disabled from engaging in any gainful occupation for which the Insured is reasonably fitted or qualified and under the regular care and attendance of a legally qualified physician or surgeon, other than himself * * *."
Defendant contends that there is no genuine issue of material fact and, as a matter of law, plaintiff, in undergoing the training and performing the duties as a resident in psychiatry at the aforesaid institutions, has been heretofore engaged in and is now engaging in a gainful occupation for which he is reasonably fitted or qualified, thereby disqualifying him from receiving the indemnity payments for "total disability" under part II of the extended professional disability policy.
The foregoing summary of the facts is not materially disputed, and if there be numerous factual questions involved which should be determined by a jury, as alleged by plaintiff, they have not been called to the attention of the court and do not appear in any of the pleadings, proofs, arguments and briefs of counsel. To the contrary, defendant admits all of the recited facts.
The issue here involves the construction of the indemnity clause under part II of the extended professional disability policy. There appear to be two distinct types of disability insurance: (1) occupational disability insurance, which is intended to insure against disability of the insured to engage in his specific usual occupation, or (2) general or total disability insurance, which is intended to insure against disability of the insured in any occupation for which he may be reasonably suited. Dittmar v. Continental Casualty Co., 29 N.J. 532, 540 (1959); see also 29 Am. Jur., Insurance, section 15; 29 A Am. Jur., Insurance, section 1516, p. 620.
It is relevant to determine whether the extended disability policy, in part II thereof, contains an occupational disability clause or a general or total disability clause, because *316 plaintiff may be totally disabled to pursue his specific usual occupation (pediatrics), i.e., occupationally disabled, but not generally and totally disabled from pursuing an occupation for which he may be reasonably suited (general practitioner, psychiatrist, etc.). See Dittmar, supra. The distinction is important because if the extended disability policy should be construed as intending to indemnify the plaintiff from occupational disability, i.e., to insure against disability of the insured to engage in his specific usual occupation of pediatrics, then a different factual and legal pattern is projected which could not be resolved by the present state of the record. After reading both policies this court concludes that the disability insurance or indemnity afforded by the extended disability policy in part II is for general or total disability and not occupational disability.
An insurance policy is simply a contract, whose provisions of which should be construed like those in any other contract. Caruso v. John Hancock Mut. Life Ins. Co., 25 N.J. Misc. 318, 53 A.2d 222 (Sup. Ct. 1947), affirmed per curiam 136 N.J.L. 597 (E. & A. 1947); followed in Smith v. Metropolitan Life Ins. Co., 29 N.J. Super. 478 (App. Div. 1954); see also 44 C.J.S. Insurance, section 289, p. 1136.
Two or more writings which are all parts of one transaction relating to the same subject matter are to be read and interpreted as one instrument, whether or not they refer to each other, though the writings were not executed on the same day. Wellmore Builders, Inc. v. Wannier, 49 N.J. Super. 456 (App. Div. 1958); see also 44 C.J.S. Insurance, section 299, pp. 1200, 1201.
The original disability policy (No. P310863) provides for disability payments if the insured is wholly and continuously disabled and prevented from performing "any and every duty pertaining to his occupation or profession." The foregoing disability payments were effective for a period of 24 consecutive months. The extended disability policy, on the other hand, provides for additional disability payments to the insured to commence on the first day of the 25th month following *317 a previous period of 24 consecutive months during which the insured shall be wholly and continuously disabled and prevented from performing "any and every duty pertaining to his occupation or profession."
Obviously, then, the extended disability policy, in referring to the previous period of disability of 24 consecutive months was referring to the disability payments allowed under its original policy (No. P310863), i.e., exact disability language is used in both policies to cover the original 24 consecutive months, and the extended disability policy therefore refers to the 24-month period in the original policy.
The phraseology, "prevented from performing each and every duty pertaining to his occupation," was interpreted in the Dittmar case as constituting occupational disability, as opposed to general total disability. In other words, such phraseology describes a disability of the insured to engage in his specific usual occupation. The degree of similarity between the phrase "any and every duty pertaining to his occupation or profession" in this case with the phrase "each and every duty pertaining to his occupation" is so equal that no other reasonable conclusion could be made than that the disability provided for in the original policy (No. P310863), and in the first part of part II in the extended disability policy (i.e., for the 24 month period of previous disability), refers to occupational rather than general or total disability.
However, the additional disability, i.e., 60 months after the 24-month period, provided for by the extended disability policy in part II, is payable "for the period the insured shall be wholly and continuously disabled from engaging in any gainful occupation for which the insured is reasonably fitted or qualified." Although no New Jersey case has referred or construed the type of disability clause in this case, the definition of general or total disability in the Dittmar case, i.e., disability "in any occupation for which he may be reasonably suited," is almost identical with the phraseology used in part II of the extended disability policy in this case, namely, in gainful occupation for which the insured is reasonably fitted *318 or qualified  the only significant difference being the word "gainful" contained in the extended disability policy under consideration.
The use of the words "any gainful occupation for which the Insured is reasonably fitted or qualified" instead of "any and every duty pertaining to his occupation or profession" indicates an intention on the part of the parties not to limit the total disability in the extended disability policy to the inability of the plaintiff to perform the duties of a pediatrician i.e., his specific usual occupation.
It is my conclusion that the only reasonable interpretation of the disability provision in the extended disability policy applicable to the extended period of disability (60 months) is that it provides indemnity for general or total disability as defined in the Dittmar case, i.e., inability to do all the substantial and material acts necessary to the prosecution of such other business or occupations which he might reasonably be expected to pursue by virtue of his training, education and experience.
The only remaining issue is whether or not such activity or occupation by the plaintiff constitutes gainful employment. Ordinarily, the period of study and training could not be regarded as an "occupation" much less a "gainful one," because of the personal sacrifice, expenses involved and the lack of substantial or fair remuneration in training for any specialty in medicine, in this case the science or art of psychiatry. However, in this instance the Institute has established a program of grants to qualified institutions to enable them to finance the study and training of qualified individuals or physicians who desire to be psychiatrists. It has also authorized and given to these qualified institutions funds with which to pay special trainee stipends to such qualified individuals or physicians in order to enable these institutions to provide support at an adequate level for psychiatric residency training for physicians in practice who wish to become psychiatrists.
*319 Since the purpose of the program as well as other portions indicates clearly that a practicing physician, whether he be a general practitioner or medical specialist, might reasonably be expected to pursue such study or training, this court concludes that the study of and the training in psychiatry at the qualified institutions aforesaid, made possible by the grant of funds from the Institute to qualified institutions, is an occupation which plaintiff, by virtue of his training, education and experience, might reasonably be expected to pursue. Consequently, it is an "occupation for which the Insured is reasonably fitted and qualified" under part II of the extended disability policy.
Generally, the mere fact that the insured is receiving some income or even salaried income from another source which is not in the open labor market does not preclude him from recovering indemnity under a disability policy. 29 A Am. Jur., Insurance, section 1519, p. 624; see also Annotation, "Disability Insurance," 149 A.L.R. 7, 60 and 153 A.L.R. 430, 436. If the payments are made by a charitably inclined employer, or if the new employment is procured through charity, friendship or political intervention, and not in the open labor market, the insured is not thereby disqualified from collecting indemnity under the disability policy.
However, the foregoing has no application to the present issue. The training and study program sponsored by the Institute, i.e., the psychiatric training program for those physicians who desire to become psychiatrists, is generally available to any physician who has completed his internship and four years of actual practice. In other words, the motive of the applying physician, his physical condition to pursue another medical specialty, or his financial status, has no bearing on his eligibility to qualify for the study and training he will eventually undergo to become a psychiatrist.
In the great majority of cases in which the courts considered the question of the quantity of the compensation in the above circumstances it has been held that total disability within the meaning of the disability clause contemplates that the compensation earned or to be received from the occupation *320 or employment engaged in shall in a fair sense be remunerative, and not merely nominally so. Annotation, "Disability Insurance," supra.
It would be difficult to conclude that a $12,000 stipend is not reasonably substantial and that it does not rise to the dignity of an income or livelihood even for a physician, particularly since plaintiff has not paid nor will he be required in the future to pay (1) any tuition for such instruction, or (2) any fee for any books, laboratory use or any other expense incident to such study and training.
Plaintiff is not only suited or able to engage in other occupations which he might by reason of his training, education and experience reasonably be expected to pursue, but he is in fact at the present time so engaged.
In conclusion, I find that no genuine issue as to any material fact exists and that plaintiff is pursuing his studies and training in psychiatry at the Philadelphia Psychiatric Hospital and at the Philadelphia Guidance Clinic for which he is receiving and has received annually a special trainee stipend of $12,000. He has been and is presently engaged in a gainful occupation for which he is reasonably fitted or qualified, as provided in part II of the extended professional disability policy No. X3310863, thereby disqualifying him from collecting the indemnity payments provided for by the said policy.
Defendant's motion for summary judgment is hereby granted, and an order in conformity with these conclusions may be entered.